UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF PENNSYLVANIA

```
UNITED STATES OF AMERICA,  :    CRIMINAL CASE
                           :
        Plaintiff(s)       :    Case No. 2:18-cr-00026-JHS-1
                           :             2:19-cr-00417-JHS-1
                           :
    v.                     :    Philadelphia, Pennsylvania
                           :    June 3, 2021
JUSTIN DAVID MAY,          :    Time 10:04 a.m. to 12:12 p.m.
                           :
        Defendant(s)       :
. . . . . . . . . . . . . .
```

TRANSCRIPT OF SENTENCING HEARING
BEFORE THE HONORABLE JOEL H. SLOMSKY
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the Government:          Michael S. Lowe, Esq.
                             U.S. Attorney's Office
                             615 Chestnut Street, Ste. 8136
                             Philadelphia, PA 19106


For Justin David May:        Natasha Taylor-Smith, Esq.
                             Federal Comm. Def. Off. for EDPA
                             601 Walnut Street, Ste. 540 West
                             Philadelphia, PA 19106


Court Recorder:              A. J. Follmer
                             Clerk's Office
                             U.S. District Court


Transcription Service:       Precise Transcripts
                             45 N. Broad Street
                             Ridgewood, NJ 07450


Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

2

INDEX

|  | D | C | RD | RC | FRD | FRC |
|---|---|---|---|---|---|---|
| WITNESSES FOR DEFENSE: | | | | | | |
| Susan Stanton | 29 | | | | | |

```
1                    (Proceedings started at 10:04 a.m.)
2              JUDGE JOEL H. SLOMSKY:  Please be seated.
3              COUNSEL NATASHA TAYLOR-SMITH:  Good morning, Your
4    Honor.
5              COUNSEL MICHAEL S. LOWE:  Good morning, Your
6    Honor.
7              THE COURT:  Good morning.  Before, before we
8    begin, I just want everybody to know you have to sit at a
9    seat with a green checkmark behind you.  Okay.  Alright,
10   we're on the record.  This is the cases of United States
11   versus Justin David May, criminal numbers 18-26 and 19-479
12   and representing Mr. May is Natasha Taylor-Smith, welcome.
13             MS. TAYLOR-SMITH:  Good morning, Your Honor.
14             THE COURT:  Good morning.  And I note the
15   presence of Mr. May in court.  Good morning.
16             JUSTIN DAVID MAY:  Good morning, Your Honor.
17             THE COURT:  Good morning and welcome.  And the
18   Government is represented by Michael Lowe or Assistant
19   U.S. Attorney.
20             MR. LOWE:  Good morning, Your Honor.
21             THE COURT:  Welcome.  And seated with you at
22   counsel table is --
23             SPECIAL AGENT SEAN NORMAN:  Special Agent Sean
24   Norman (ph) of the FBI.
25             THE COURT:  Welcome.  Alright.
```

1          MR. LOWE:  Your Honor, there was -- I think the

2     Court misspoke on the case number for the 19 case.  It's

3     19-417.

4          THE COURT:  19-417, yes.

5          MR. LOWE:  Okay.  Thank you, Your Honor.

6          THE COURT:  Yeah.  Alright, we're here today for

7     sentencing on the September 6, 2018.  Mr. May appeared

8     before me on criminal indictment number 18-26 and entered

9     guilty pleas to counts 1 through 20 and 31 through 45 and

10    the Government will be moving to dismiss after today

11    counts 21 through 30 I believe.

12         MR. LOWE:  That's correct, Your Honor.

13         THE COURT:  And on July 18, 2019 -- I'm sorry, on

14    September 12, 2019, Mr. May appeared before me again and

15    entered a guilty - an open guilty plea to counts 1 through

16    22 of criminal indictment number 19-417 and the first

17    indictment I referred to, 18-26, was a guilty plea

18    pursuant to a, a plea agreement that the defendant had

19    with the Government.  And before I came to court today, I

20    read the revised Presentence Report dated March 10, 2020

21    and I read the document number 33 which is the defendant's

22    sentencing - let's see it's not document 33, it's -- well

23    apparently there was, there was a different memoran—

24    different times when the memorandums were filed but I'm

25    looking at document number 51, Counsel, and that's titled

1    Defendant Sentencing Memorandum and Request for a Variance
2    and I read the attachments carefully that include a letter
3    from David Stanton.  I read a letter from, report
4    actually, from Kenneth Weiss, M.D. (ph) that, dated April
5    27, 2021 which is timely.  I read a letter from an Andrew
6    Puddington (ph) and I also read a letter from Susan
7    Stanton (ph), Mr. May's mother, and I also reviewed the,
8    and read the Government's Sentencing Memorandum which is
9    document number 26 in the record.  I believe these, the
10   documents, have been filed in both cases, am I correct?
11            MR. LOWE:  Yes, Your Honor.
12            MS. TAYLOR-SMITH:  Yes, Your Honor.
13            THE COURT:  Alright.  I have in front of me also
14   a, an Order of Forfeiture.  Apparently, the, the
15   Government is seeking to forfeit at least $38,036.00 in
16   criminal indictment number 19-417.  I don't think there's
17   an objection to that.  Is that correct?
18            MS. TAYLOR-SMITH:  There is no objection, Your
19   Honor.
20            THE COURT:  Alright.  So, let me sign that order
21   and we'll make that part of the record.  And today is the
22   3rd day of June.  I'm changing the year to 2021.  And that
23   order will be made part of the record and completes that.
24   Now, I realize I referred to another filing in both cases,
25   which is document 33-6 but I, I think that was

1    supplemented?

2            MR. LOWE:  Your Honor, I'm not sure about that

3    one but there is a, there's another Order of Forfeiture,

4    motion for Order of Forfeiture on proposed order in case

5    number 18-26.

6            THE COURT:  18-26?

7            MR. LOWE:  I have, if Your Honor would like, I

8    have a copy.

9            THE COURT:  Yeah, let me see that.  I don't have

10   that in front of me.

11           MR. LOWE:  It's document number 28 on the docket

12   list, Your Honor.

13           THE COURT:  Okay.  And this seeks forfeiture of

14   an amount up to $299,587.00 in criminal indictment number

15   18-26.  Is that correct?

16           MR. LOWE:  Yes, Your Honor.

17           MS. TAYLOR-SMITH:  That's correct, Your Honor.

18           THE COURT:  And I believe, believe there's no

19   objection to that also.

20           MS. TAYLOR-SMITH:  That is correct.

21           THE COURT:  Alright.  So, I -- alright, I have

22   read that order, it seems appropriate.  I will sign that

23   order.  Now, Ms. Taylor-Smith, again, I, I just want to

24   make sure I put on the record everything I've considered.

25   I'm not sure what 33-6 is.  It looks like your Sentencing

1   memo with attachments.  It may have been filed - this one

2   was filed on 6, 6/1/21.

3           MS. TAYLOR-SMITH:  I'm sorry, you said on 6 --

4           THE COURT:  Document 33.

5           MS. TAYLOR-SMITH:  Your Honor, I don't believe

6   that's Court's involved in.

7           THE COURT:  Maybe -- it looks like it was part of

8   the record.  The, the order attached is --

9           MS. TAYLOR-SMITH:  Is the, is the sealing order

10  attached to what was filed on the record?

11          THE COURT:  Yeah.  You've asked that your

12  Sentencing memo be filed under seal, correct?

13          MS. TAYLOR-SMITH:  That's correct.

14          THE COURT:  Alright.  I, I'm going to sign that

15  order too.  I assume there's no objection today.

16          MR. LOWE:  No objection, Your Honor.

17          THE COURT:  Alright.  Let me just sign that.  And

18  we'll make, make that order part of the record also.  And

19  that's in both cases, that'll be filed in both cases.

20          MS. TAYLOR-SMITH:  Yes, Your Honor.

21          THE COURT:  Alright.  Let me just show this to

22  Ms. Taylor-Smith.  Can you just, just explain to me the

23  difference?  Let's see, if we can have our staff here --

24  they look identical but they're filed under different

25  numbers.  I just want to make sure.

1          MS. TAYLOR-SMITH:  Sir, I actually have no idea
2     how this could've happened.
3          THE COURT:  You've got to --
4          MS. TAYLOR-SMITH:  Oh, I have no idea how this --
5          THE COURT:  Wait, wait, wait, wait.  First,
6     you've got to speak into a mic.
7          MS. TAYLOR-SMITH:  I'm sorry.
8          THE COURT:  If this is going to be on the order,
9     you have to speak into a mic.
10          MS. TAYLOR-SMITH:  Your Honor, I know exactly
11     what happened.
12          THE COURT:  Go ahead.
13          MS. TAYLOR-SMITH:  Your, your court deputy was
14     out last week and so when I filed my Sentencing Memorandum
15     initially, I emailed it to your chambers asking that it be
16     filed under seal, but because I don't have the ability
17     myself to file documents under seal, I sent it to my
18     admin- my legal assistant as well telling her that it's
19     already been forwarded to chambers; however, it needed to
20     be filed under seal.  It looks like both, what I send to
21     chambers initially and what I gave to my legal assistant,
22     which are exactly the same documents, both got filed under
23     seal.
24          THE COURT:  Okay.  I just want to make sure I put
25     on the record everything I've considered and those are

1   duplicates.  So, has anything else been submitted that I

2   have not referred to?

3           MS. TAYLOR-SMITH:  Nothing from the defense.

4           MR. LOWE:  No, Your Honor.

5           THE COURT:  Alright.  At this point, we have to

6   place Mr. May under oath.

7           ESR/CLERK A.J. FOLLMER:  Mr. May, please raise

8   your right hand.  Do you solemnly swear or affirm the

9   testimony you're about to give to this Court shall be the

10  truth, the whole truth and nothing but the truth, so help

11  you God or you do so affirm?

12          DEFENDANT:  I do.

13          ESR/CLERK FOLLMER:  Please state your full name,

14  spell your last name for the record.

15          THE DEFENDANT:  Justin David May.  Last name M-A-

16  Y.

17          ESR/CLERK FOLLMER:  Thank you.

18          THE COURT:  Alright.  Mr. May, I, I just have to

19  ask you a few questions.  Do you understand that you're

20  here for sentencing today?

21          THE DEFENDANT:  I do, Your Honor.

22          THE COURT:  And have you had enough time to

23  discuss sentencing with your attorney?

24          THE DEFENDANT:  I have, Your Honor.

25          THE COURT:  If you need more time, you can have

1    it.  Do you need more time?

2              THE DEFENDANT:  I do not, Your Honor.

3              THE COURT:  And is there any reason why we should

4    not proceed to sentencing today?

5              THE DEFENDANT:  No, Your Honor.

6              THE COURT:  Same question for Ms. Taylor-Smith.

7    Any reason why we shouldn't proceed to sentencing today?

8              MS. TAYLOR-SMITH:  No, Your Honor.

9              THE COURT:  Mr. Lowe?

10             MR. LOWE:  No, Your Honor.

11             THE COURT:  Alright.  Mr. May, have you read the

12   revised Presentence Report dated March 10, 2020?

13             THE DEFENDANT:  I have, Your Honor.

14             THE COURT:  And have you reviewed the report with

15   your attorney?

16             THE DEFENDANT:  I have, Your Honor.

17             THE COURT:  And did your attorney explain to you

18   what's in the Presentence Report and what it means?

19             THE DEFENDANT:  Yes, Your Honor.

20             THE COURT:  Did she answer all your questions

21   about the report and what's in the report?

22             THE DEFENDANT:  I did, Your Honor.

23             THE COURT:  Do you need any additional time to

24   talk to counsel about what's in the Presentence Report?

25             THE DEFENDANT:  No, Your Honor.

1          THE COURT:  Alright.  Now, is there anything in

2     the report that is, is being objected to?  And I, I might

3     preface that by saying I read in the Defendant's

4     Sentencing Memorandum, I believe, that there was some

5     challenge to the sophisticated means enhancement.

6          MS. TAYLOR-SMITH:  That's correct, Your Honor.

7          THE COURT:  Alright.  And, and let's see, is that

8     the only challenge to what's in the Presentence Report?

9          MS. TAYLOR-SMITH:  That's correct, Your Honor.

10    There was initially an objection made to the loss amount

11    but based upon the method used to calculate the intended

12    loss in this mat- in this man- in this matter, I'm

13    withdrawing my objection to the loss amount.

14         THE COURT:  Alright.  So, the loss amount as

15    calculated by the U.S. Probation Officer is, is not being

16    objected to?

17         MS. TAYLOR-SMITH:  That is correct.

18         THE COURT:  Alright.  Now --

19         MR. LOWE:  Your Honor, before we get into the

20    objection, I just wanted to point out, Ms. Taylor-Smith --

21         THE COURT:  You got, you've got to speak into a

22    mic, Mr. Lowe.

23         MR. LOWE:  I'm sorry, Your Honor.

24         THE COURT:  Go ahead.

25         MR. LOWE:  Ms. Taylor-Smith may want to withdraw

1    the objection to intended loss because the defendant did -

2    - excuse me, to sophisticated means, the defendant did

3    stipulate in the plea agreement in case number 18-026 that

4    the Cisco and Microsoft fraud schemes utilized

5    sophisticated means that the defendant himself personally

6    utilized sophisticated means in connection with the

7    schemes and that his offense level should be increased by

8    plus 2 under section 2(b)1.1(b)10(c) of the guidelines.

9    And that's, that paragraph 11(b) at page 10 of the plea

10   agreement.  If he continues to assert this objection, it's

11   yet another breech of the plea agreement.  I think he may

12   want to rethink this objection.  If not, I'm prepared to

13   argue it.

14        THE COURT:  Alright.  I, I noticed that too in

15   the plea agreement that, that paragraph dealing with an

16   agreement on sophisticated means.  Let me see.  And that's

17   paragraph 11(b) you just read, read from in criminal

18   number 18-26.

19        MS. TAYLOR-SMITH:  Court's indulgence.  Your

20   Honor, I will withdraw my objection.

21        THE COURT:  Alright.  So, there's, there's no

22   objection to what's in the Presentence Report from either

23   side at this point, correct?

24        MS. TAYLOR-SMITH:  That's correct, Your Honor.

25        MR. LOWE:  Correct, Your Honor.

1          THE COURT:  Alright.  And so, the first thing I

2   want to do is calculate the applicable federal sentencing

3   guidelines in this case and I, I, I like to say it at the

4   beginning of the sentencing proceeding that we have in, as

5   part of the federal judiciary, a United States Sentencing

6   Commission.  And the Sentencing Commission has promulgated

7   a, a guidelines manual.  The latest manual is dated 2018

8   and, in this manual, which is quite extensive at this

9   point, it wasn't as extensive back in 1987 when the

10  guidelines were first put in place in the federal system,

11  but the manual contains information about rating offenses,

12  rating defendants, does the defendant have prior

13  conviction or no prior conviction.  There's a lot of

14  information in the guideline manual and before 1987 if two

15  people committed the same crime and both of them, let's

16  say, had no prior record, and the crime carried a penalty

17  of, let's say, zero to 10 years imprisonment, if one

18  defendant appeared before one judge, the defendant might

19  get once sentence and if that defendant appeared before

20  another judge, he might get a completely, completely

21  different sentence than the first judge imposed.  And it

22  wasn't considered fair and it's not fair.  And an attempt

23  to make sure people are treated fairly and with parity in

24  sentencing, in 1987 through legislation passed by the

25  Congress, a guideline system went in, into, into effect.

1  And in the back of this big book I'm holding up, there's

2  a, what we call a sentencing table with offense levels

3  and, as you go across the age, prior - how many criminal

4  history points a person has and there are guideline ranges

5  for a sentence, especially a sentence for imprisonment in,

6  in the manual that we look to.  And until 2005, what was

7  contained in this manual was the guideline ranges the

8  judge found at sentencing was mandatory.  The judge had to

9  impose a sentence within that range unless there was some

10 reason to, what we call, depart from it for reasons that

11 are contained in, inside the manual.  In 2005, the U.S.

12 Supreme Court handed down a decision and said if this

13 system of sentencing, guideline sentencing is to be

14 constitutional, the guidelines are only advisory, they're

15 just guidelines, they're not mandatory.  And we have

16 another federal law.  It's, it's found in 18 USC Section

17 3553(a) which lists all the factors that we have to

18 consider before we sentence someone and one of the factors

19 is the sentencing guidelines.  But we're still required to

20 calculate the guidelines at sentencing and the probation

21 officer has calculated the guidelines for the two cases

22 and it's in the Presentence Report.  So, let me go through

23 these, these guidelines.  The -- there are what we call

24 two groups of offenses here.  Some of these offenses, for

25 purposes of calculating the guidelines, are combined but

1    some of them aren't.  Usually, the fraud and money

2    laundering counts are combined in one group but Mr. May is

3    also charged with two counts of tax evasion and that's not

4    grouped with the fraud and money laundering guidelines.

5    And we have provisions within the sentencing manual on how

6    to handle different groups of offenses.  So, with respect

7    to group one, the fraud and money laundering offenses, I'm

8    looking at page 30 of the Presentence Report in paragraph

9    65.  The guideline for a violation of 18 USC Section 1341

10   is found in guideline section 2B1.1.  That section

11   provides that an offense involving mail fraud has base

12   offense level of 7, that says statutory maximum term of

13   imprisonment is 20 years or more under section 2B1.1(a)1,

14   an offense level of 7 would be the base offense level.

15   There's a specific offense characteristic that would

16   increase the base offense level since the intended loss in

17   this case exceeded 3.5 million but was less than 9.5

18   million, specifically, agreed upon intended loss of

19   $3,631,647.66.  The base offense level is increased by 18

20   levels pursuant to guideline section 2B1.1(b)(1)(J).

21   There are three other reasons why the offense level is

22   increased in this case.  In paragraph 67, there's a

23   specific offense characteristic that was referred to

24   earlier, the offense level is increased by two levels

25   since the defendant personally utilized sophisticated

1   means in connection with the offenses.   Under

2   2B1.1(b)(10)(C), there's a two-level increase.   Paragraph

3   70 notes that there's a three-level increase for, for

4   obstructing justice.   The defendant committed the conduct

5   charge in 19-417 while on bond pending sentencing in

6   criminal number 18-26.   Since the statutory enhancement

7   under 18 USC Section 3147 applies, the offense level is

8   increased by three levels under sentencing guideline

9   section 3C1.3.   There's also another upward offense level

10   adjustment for obstruction of justice for another reason.

11   The defendant registered false domain names during the

12   fraud scheme and the statutory enhancement under 18 USC

13   Section 3559(g)(1) applies; therefore, two levels are

14   added under guideline section 3C1.4.   So, for group one,

15   the group one offenses of fraud and money laundering, the

16   adjusted offense level is a total of 32.   For the tax

17   evasion group two offense, the guideline for a violation

18   of 26 USC 7201 is found in 2T1.1 of the guidelines and

19   pursuant to that provision of the guidelines, a base

20   offense level is a level from another guideline provision,

21   2T4.1 which is the tax table corresponding to the tax

22   loss, which in this case was $52,497.00.   Since the tax

23   loss was more than $40,000.00 but less than $100,000.00,

24   the offense level is 14 for the group two tax evasion

25   charges and that's pursuant to guideline section 2T4.1(a).

1   There is a specific offense characteristic that adds two

2   offense levels to that base offense level, the tax

3   evasion.  Two levels are added because the defendant

4   failed to report or correctly identify the source of

5   income exceeding $10,000.00 in any year from criminal

6   activity.  So, pursuant to guideline section 2 -

7   2T1.1(b)(1), speci- the, there's a two-level increase and,

8   more specifically, the defendant earned at least

9   $26,071.00 in 2015 and $213,570.00 in 2016, consisting

10  almost exclusively of fraud proceeds.  There is no other

11  adjustment under the group two tax offense, yeah, tax, tax

12  offense - tax evasion group so that the adjusted offense

13  level would be 16.  Now, we have two groups of offenses,

14  one with an offense level of 32, one with an offense level

15  of 16 and we have to do under the guidelines what we call

16  a multiple count adjustment and units are assigned under

17  another provision of the guideline.  This is in paragraph

18  80.  The total number of units would be one.  There, there

19  are no units for the count - the group two counts.

20  Therefore, under section 31 - 3D1.4 of the guideline, the

21  way the guidelines work, there would be no increase in the

22  highest offense, offense level for the group one offense

23  so that the combined adjusted offense level is 32 as

24  indicated in the table at 3D1.4.  So, the total offense

25  level is, as noted in paragraph 86 of the Presentence

1    Report, is 32.  Mr. May has an adult convictions to which

2    criminal history point attach.  In 2012, at age 22, he

3    plead guilty and was sentenced for criminal mischief,

4    doing damage to property under $1,000.00 and disorderly

5    conduct.  And that's in paragraph 88.  Paragraph 89,

6    1/16/2018 at age 28, he has a conviction for terroristic

7    threats.  He plead guilty and was sentenced and one point

8    is attached to that conviction.  So, as a result of these

9    convictions, he has a subtotal criminal history score of 2

10   and that's noted in paragraph 90 in the Presentence

11   Report.  Paragraph 91 says that the defendant committed

12   the conduct in the first case before me, criminal number

13   19-417, while he was on probation in New Castle County,

14   Delaware for one of those offenses I mentioned and

15   therefore two points are added under guideline section

16   4A1.1(d) so that his total criminal history score is 4.

17   And according to the sentencing table in the, in the

18   guidelines that I held up in the back of the book, a

19   criminal history score of 4 establishes that he be placed

20   in what we call criminal history category 3.  As noted in

21   paragraph 126 of the Presentence Report, based upon a

22   total offense level of 32 and a criminal history category

23   of 3, the guideline range for imprisonment is 151 to 188

24   months and, again, this is not, this is just one factor I

25   have to consider in deciding the sentence in this case.

1   But we're required to calculate the guidelines initially

2   at sentence under the law and I also have to ask counsel

3   whether or not there are any departures being advanced

4   pursuant to what's in the guideline manual or just whether

5   counsel is going to pursue variances from the, the

6   guideline.  Any departures, Mr. Lowe?

7           MR. LOWE:  No, no, Your Honor.

8           MS. TAYLOR-SMITH:  Your Honor, there are no

9   motion for departure.  I do, however, have a motion for a

10  variance.

11          THE COURT:  Yes.  Alright.  So, at this point,

12  let me hear from Ms. Taylor-Smith as to what would be an

13  appropriate sentence, advocating obviously for a variance.

14          MS. TAYLOR-SMITH:  Your Honor, if, if the Court

15  just wants me to start off with what I believe would be an

16  appropriate sentence in this matter, I think that if the

17  Court were to take into consideration where the sentencing

18  guidelines came out in terms of the, the final base

19  offense level or the total offense level that this Court

20  has taken into consideration, I would ask that the Court

21  consider varying down approximately seven levels.  And the

22  reason for my request is that as I stated in my

23  Presentence - in my Sentencing Memorandum, most of the

24  guidelines in this case are driven by the intended loss

25  amount.  And while the defendant does not object to the

1    calculation of the intended loss amount because we

2    believes it's correct, I think that I put into my

3    Sentencing Memorandum that the Court should at least

4    consider my client's neurological disorder in, in, in

5    determining whether or not he participated in this offense

6    as a result of greed, whether or not he was trying to get

7    rich, whether or not he ultimately ended up with anything

8    close to three million dollars or three plus million

9    dollars, either him or any of his co- his co-schemers or

10   whether or not it was more as a function of, based on what

11   we've seen in the psychiatric report, the rigid

12   repetitiveness of the crime itself and how my client's

13   neurological disorder lends to the same.  Additionally,

14   Your Honor, prior to his commission of the second offense

15   in this case that he plead guilty before the Court, Mr.

16   May was in fact being considered by the Government for a

17   5K1.1 motion which I will discuss in further detail as a

18   result of the cooperation that he had provided to the

19   Government.  He met with agents of the Government before

20   he was arrested and provided information on both his own

21   crime and the crimes of others.  He met with the

22   Government after he was arrested, after he was indicted on

23   the initial case and provided detailed information, not

24   only as to his own criminal activity but as to the

25   identity and criminal activity of the co-schemers in this

1   case and the, at least online identity of individuals who

2   were committing a number of cybercrimes across the United

3   States.  And finally, he even assisted in the apprehension

4   of an individual who had eluded law enforcement for at

5   least a few months who I believe was wanted out of Florida

6   for drug - drug trafficking offenses.  I'm asking that the

7   Court take those things into consideration when the Court

8   is fashioning a sentence that is sufficient but not

9   greater than is necessary to meet the sentencing goals of

10  3553(a).  And so, that would be my request, Your Honor.

11        THE COURT:  Alright.  Now, you, you want me to

12  depart seven levels.  So, as I look at the book from level

13  32, you want me to go down to level 25 and criminal

14  history category 3 to 70 to 87 months?

15        MS. TAYLOR-SMITH:  That's correct, Your Honor.

16        THE COURT:  Alright.  And, Counsel, you alluded

17  to his, his I'll call it mental disorder?

18        MS. TAYLOR-SMITH:  Yes, Your Honor.

19        THE COURT:  I, I read the, the doctor's report.

20  Can you elucidate on that a bit more?

21        MS. TAYLOR-SMITH:  Of course, Your Honor.  Your

22  Honor, as this Court is aware, my client is an individual

23  living with ASD.  He lives with the spectrum -- he's

24  living, an individual living with autism.  He's on the

25  spectrum.  As a result of this, and I was going to go into

1   this in more detail when I just gave my sentencing

2   remarks, but as a result of his developmental disorder, it

3   is something that he was born with.  It is something that

4   he has struggled with his entire life but as a result of

5   his disorder, he has difficulty with a syndrome that the

6   psychiatrist calls mind blindness.  Essentially, it may

7   seem to others that he has a lack of respect for other

8   individuals, not just the law but for other individuals.

9   It may appear to others that he has a lack of empathy for

10  his own actions but what it is, is that he truly has

11  difficulty, real difficulty associating his own behaviors

12  with the impact that those behaviors have on the outside

13  world.  He simply has, has trouble with it.  He is better,

14  according to the psychiatrist, when he has prosocial -

15  when he's surrounded by a prosocial community.  The Court

16  will notice from both the Presentence Report that was

17  originally written and from the psychiatric report, Mr.

18  May did a really good job of separating himself and his

19  criminal activities from the family that loved him and

20  supported him and is present today in the courtroom.  And

21  as a result of that, what Mr. May calls his tether to

22  mainstream society have been cut and that ultimately led

23  him to retreat to an online world where he learned this

24  scheme.  I, I don't want the Court to be confused about

25  how this all came about.  It's not as if Mr. May one day

1    woke up and said I think it would be a great idea if I
2    made up fake serial numbers and decided to defraud Cisco
3    and, and Lenovo and Microsoft of millions of dollars.
4    Someone else that he encountered online was participating
5    in this scheme and because Mr. May's disorder kind of
6    forces him to mimic the behaviors of others, particularly
7    if he is seeking some sort of social acceptance from those
8    individuals.  You will note in a letter that was written
9    by his step-father, there is a story about when Mr. May
10   was a child and that the only kind of prosocial
11   communications that he had with his classmates was when he
12   learned how to put video games on the school computer.
13   And so, for a short period of time, he was a hero to
14   individuals who otherwise would not even speak to him in
15   the hallways.  His participation in this online criminal
16   scheme began that way.  I, I would ask that the Court --
17   Court's indulgence, because I want to read specifically
18   from the psychiatric report.  According to Dr. Weiss,
19   Weiss, seeking human contact as persons' with ASD do, his
20   world became his online connections.  With his deficits,
21   he found peer acceptance without fully appreciation for
22   the wrongfulness of his actions.  That is, he became adept
23   at the mechanics of the cybercrimes for which he was
24   convicted but did not understand the moral reason that
25   they were wrong.  This deficit is in the cognitive domain

1    of theory of mind or mind blindness, the ability to

2    appreciate the mental state of others.

3         THE COURT:  I, I have a question.  Obviously, one

4    of the considerations here is the fact that while he was

5    on pretrial release in the first case, he engaged in the

6    same exact conduct in the second case.  And a concern a

7    Court would have is, given the, the condition he has, that

8    when he's released, he might be susceptible to doing it

9    again.  What's, what's to prevent that because he's - even

10   after he's released from custody, he's in custody now,

11   he'll still be under what's called supervised release of

12   the Court and we don't want to see him back, want him to

13   be a good citizen and a productive citizen.  What, what

14   would be, what's being done to protect the public from

15   further crimes like this, by this, 'cause there are, there

16   are definite victims in a case like this?

17        MS. TAYLOR-SMITH:  Your Honor, I actually wrote

18   something specific to that for the Court.  And when I talk

19   about specific deterrent as it relates to Mr. May, there

20   is no doubt that he did not fully appreciate what a period

21   of incarceration looked like.  I, I, I know this from my

22   personal interactions with him.  I know this from

23   interactions with his family members.  There's no doubt

24   that although he may have seen what incarceration looked

25   like in movie theaters, he did not appreciate the impact

1    that a period of incarceration would have on an individual

2    who is living with ASD as himself.  Imagine for a moment,

3    Your Honor, the level of stimuli that he is subjected to

4    on a regular and consistent basis while he is in prison.

5    Mr. May and other individuals who are on the spectrum

6    function best when they can create regimens for themselves

7    and follow those regimens.  And during this period of

8    incarceration, he had been subjected to sounds and sights

9    and lighting and physical touching that on a regular

10   consistent basis is essentially torturous to him.  As a

11   result, after he was incarcerated in this case, he reached

12   out to his family in a way that he had not since he left

13   the family home.  He included his mother in every decision

14   that he was making from pleading guilty to the second

15   indictment, to showing up for sentencing, to helping

16   gather letters on his behalf in a way that he had

17   completely excluded her.  If you read the Present- the

18   original Presentence Report, Ms. May told you he told his

19   family nothing about the fact that he had been federally

20   indicted for a crime and even at that point in time when

21   he was cooperating with the Government, was looking at a

22   significant period of incarceration in a federal prison.

23   He kept them completely out, out of the loop.  But as this

24   Court is aware from the bail hearing, since his period of

25   incarceration, his prosocial interactions in the community

1    have in fact buttressed and re-anchored him back into

2    mainstream society.  His disorder essentially is such that

3    he mimics the behavior of those who are closest to him and

4    he had excluded his family and his prosocial supports from

5    his life during the period of time that he was committing

6    criminal offenses.  They are here today, Your Honor, to

7    tell you that not only do they continue to support him

8    today but they will support him when he is released from

9    incarceration.

10           THE COURT:  Alright.

11           MS. TAYLOR-SMITH:  He also has a new appreciation

12   for his relationship with the medical community.  Prior to

13   his period of incarceration, he went to his therapist on a

14   regular and consistent basis because the medication that

15   he was receiving from his therapist helped him function

16   from day to day.  It was a stimulant, one he is unable to

17   get while he's in a Bureau of Prison.  But it really

18   helped him focus and be able to, to do tasks.  He didn't

19   take the rest of the therapy, therapy as seriously.  He

20   did not take the rest of the therapy to heart and it was

21   because, again, part of Mr. May's disorder is that he's

22   able to compartmentalize or was able to compartmentalize

23   and because the therapist has no idea that he was involved

24   in criminal activity, the therapist had no way to redirect

25   him.  When he's under Court supervision, that will not be

1   the case.  He will -- I would ask that this Court have

2   some sort of mental health component to whenever he is

3   released from custody.  And so, he will be able to

4   continue with the prosocial interactions that he has in

5   the community, with his mother, his step-father, his

6   brother, his friends, his real friends, Your Honor,

7   individuals not just that he met online, not just

8   anonymous faces but individuals who have met him and,

9   unlike other people that he's met during the course of his

10  life, since he started school, met him and genuinely care

11  about Mr. May, genuinely have affection for Mr. May,

12  affection that he could reciprocate in a real way, in a

13  way that he had difficulty doing as a young child because

14  of the, the extra stimuli.  So, those are some of the

15  things that I ask the Court to take into, to consideration

16  when the Court is thinking about specific deterrence as it

17  relates to Mr. May.

18          THE COURT:  Just one other question and then I'll

19  hear from your witnesses.  As someone with autism spectrum

20  disorder, ASD, he's been prescribed medi- a medication but

21  I'm reading that that medication is not available in the,

22  in the prison system.

23          MS. TAYLOR-SMITH:  That's correct.

24          THE COURT:  Have you looked into that to see if

25  there's any special way he can get it?

1          MS. TAYLOR-SMITH:  Your Honor, he cannot get the

2     same medication that he was receiving when he was in the

3     community.

4          THE COURT:  Does he get --

5          MS. TAYLOR-SMITH:  The med— that medication is a

6     sti- it has a stimulant and, and, and because it's a

7     stimulant, the Bureau of Prisons will not disseminate it.

8     They will give him something else.

9          THE COURT:  Okay.

10          MS. TAYLOR-SMITH:  But it is, it just, it does

11     not allow him to function clear-minded the way he did when

12     he was in the community.  And so, for however long he is

13     incarcerated until the Bureau of Prisons changes their

14     policy on disseminating or dispensing stimulants to

15     individuals who are incarcerated -- I think it is probably

16     because they are concerned that there could be some sort

17     of abuse of those types of substances.  So, just like any

18     other substance that is distributed, whether or not that

19     be an opioid, you can't get an opiate in prison either, so

20     it's that, you know, Tylenol with codeine while you're in

21     prison, you get Tylenol or you get Motrin and you deal

22     with the, the pain that might have been satisfied had you

23     been able to, to get an opiate.  The Bureau of Prisons --

24     and I don't fault this, for this, I mean, they, they have

25     their policy for a reason but the medication that worked

1  for Mr. May he will not be able to get while he is

2  incarcerated because it includes a stimulant.

3          THE COURT:  But he's getting some medication.

4          MS. TAYLOR-SMITH:  He is getting some medication,

5  Your Honor, and it does allow him in some respects to

6  function.  I know that when he first was incarcerated in

7  this matter, he, he, he could not have a sustained

8  conversation with me without losing focus, with, without

9  crying, without really not cooperating with his own

10  defense.  He was not asleep and he wasn't slurring his

11  words, he just had difficulty putting his thoughts down.

12  And so, we worked on some strategies for him, taking notes

13  when he was in his prison cell for example and keeping a

14  pad near him when questions came to mind so that the next

15  time I came to visit him, he wouldn't have to think about

16  what it was he wanted to ask me.  He would've written

17  those things down at some point in time earlier and he

18  could just bring the pad down to me.  So, he's learning

19  some ways to, to cope with it but he simply does not

20  function the same way without the stimulant.

21          THE COURT:  Okay.

22          MS. TAYLOR-SMITH:  And with that, Your Honor, at

23  this point I would call Susan Stanton.

24          THE COURT:  Alright.

25          ESR/CLERK FOLLMER:  Remain standing.  Please

1    raise your right hand.  Do you solemnly swear or affirm

2    the testimony you're about to give to this Court shall be

3    the truth, the whole truth and nothing but the truth, so

4    help you God or you do so affirm?

5              WITNESS SUSAN STANTON:  I do.

6              ESR/CLERK FOLLMER:  Please state your full name,

7    spell your last name for the record.

8              MS. STANTON:  My name is Susan Stanton.  My last

9    name is S-T-A-N-T-O-N.

10             ESR/CLERK FOLLMER:  Thank you.

11             MS. STANTON:  Good morning, Your Honor.  I am

12   Justin's mother.  I want to touch on a few different

13   things.  I thank you for taking the time to read my

14   letter.  I went into some great detail in that about how

15   Justin's autistic spectrum disorder affects him and it

16   forms all of the things that he's dealing with.  And I

17   provided you with that information because I wanted to

18   highlight that his psychological makeup differs a lot from

19   the typical person you may encounter in your courtroom.

20   On paper, and I understand this, he appears troubled with

21   a blatant disregard for the law but the truth is that the

22   real Justin, the Justin that you're seeing here today is

23   profoundly affected by his neurological disorder.  Justin

24   was diagnosed with this since the age of seven.  It is not

25   something new.  As far as medication goes, I don't if

1   you've reviewed his complete medical records but it is
2   thick.  We have gone through every medication that exists
3   in trying to find the best thing to treat him.  There is
4   no medication per se for autistic spectrum disorders.  You
5   treat whatever symptoms are showing at the time.  A
6   stimulant medication for someone like my son doesn't have
7   the same effect it would have on you or I where we'd be
8   bouncing off the wall.  It instead acts on a different
9   neurotransmitter and it helps keep him calm, it provides
10  him with, you know, an ability to focus.  It's what helped
11  in some way get him through school.  Throughout his entire
12  school year, I worked tirelessly with teachers and
13  administration people.  Each year we would draw up IEPs,
14  which are individual educational profiles to give Justin
15  assistive technology.  He had a one-on-one aid.  He was
16  allowed extra time for the tests.  He was given a quiet
17  place retreat when stimuli was too much for him.  He's
18  really quite simply, even at his age, a, a perfect example
19  of what a young man with an autistic spectrum disorder
20  looks like.  At the time, it was thought to be Asperger's.
21  We now know that as being autistic spectrum disorder.  To
22  address something that you brought up just recently, what
23  is going to change as far as once Justin is finally
24  released, because prior to both of his combined cases,
25  starting in 2018, Justin did not let any of us know.  His

1    family, he's got family fried who are all here today, we

2    all adore him.  He did not let us know exactly what was

3    going on because had we known, things would've been very

4    different.  He would've lived in my home.  He would've had

5    some supervision.  You know, we would've made sure that

6    once he was -- when he was initially released pending his

7    sentencing, he would've been heavily supervised.  He does

8    need to be supervised.  He also needs the ability to see

9    his therapist, a physician, to continue with his

10   medication regime so that we can get him to a point where

11   he can be a much more productive member of society,

12   especially now that all of this has happened.  My son is

13   taking accountability for his actions, in my opinion, by

14   pleading guilty to these combined charges, he's sparing

15   the Government the expense of a trial.  We're trying to

16   move past this dark point in his life.  Justin does know

17   and he does understand that time has to be served for

18   these crimes but at this point, we are now closing in on

19   23 months that he has been in federal custody for these

20   charges.  He has experienced the pandemic while

21   incarcerated, which has been, you know, additionally

22   traumatic and difficult for him, as I imagine it's been

23   for anyone afflicted with an autistic spectrum disorder.

24   My son's also an incredibly intelligent and smart young

25   man.  He's got a lot of potential.  He's got so many

1    positive things to contribute to society.  When he's

2    released, he has a place to stay in our home indefinitely.

3    He not only has the support of myself, my husband, his

4    father, his brother, friends that are here today but we

5    now know what's going on.  And without previously having

6    known, we had no way of knowing that things were this

7    severe.  Had I known, you know, when he was first

8    initially released pending his first case that here are

9    the things you have to follow, he would've been following

10   them.  We can't do something when we don't know what's

11   going on and, you know, Justin in his mind, I'm sure, was

12   thinking I want to be an adult.  I don't want to rely on

13   my disability.  I don't want to get my parents involved

14   and have them worry and I understand that.  We've all gone

15   through that as we grow up but now that we all know,

16   everyone that cares about him, we can take care of this.

17   We can, personally, you know, we will make sure that he is

18   seeing his doctor, that he is now seeing a therapist, he

19   needs to work past the reasons for these behaviors.

20   Recidivism is not an option for Justin.  Justin has never,

21   prior to these combined cases, served a day in jail.  You

22   mentioned a few other things that have happened to him,

23   Justin never spent a night in a jail, let alone nearly two

24   years.  And I know that in that time, he's had time to

25   reflect on the reasoning for this.  He's described it to

1    me as an extreme lack of self-confidence.  Justin has

2    always been looking for ways to fit in socially and with

3    people with autistic spectrum disorders, they're like

4    sponges, regardless of the age and they absorb what's

5    around them.  If you're surrounded by positive role

6    models, friends that are going to show you, life can be

7    very different, that's what you absorb.  Unfortunately,

8    you know, in the incarcerated environment he's surrounded

9    by, like Ms. Taylor-Smith mentioned, if you're surrounded

10   by a lot of things that are not going to be good things

11   for someone afflicted like he is, and, and that's what we

12   want to see.  You know, an extended sentence means he's

13   going to be once again around poor models of behavior.

14   I'm proud of him for how strong he's been through this.

15   You know, he's kept his head down.  He works in the jail

16   now.  He's made progress and yet there's so much more

17   progress for us to make with him as family and friends

18   once he is released.  You were kind enough, you know, to

19   give him a second chance before as far as releasing him

20   prior to the sentencing and then this other case happened.

21   The difference being now, everybody's onboard, everybody

22   knows what's happening, there are no secrets and, and

23   we're all about him, we're all about helping him and

24   making sure he's never going to set foot in a courtroom

25   again for anything like this.  He's got way too much to

offer to be throwing his life away like this.  So, I hope

in deciding your sentencing, I understand you have all the

guidelines but I hope you're taking into consideration

everything that Dr. Weiss has had to say and reading his

medical files, understanding where Justin's at today in

2021 versus 2018, that things have changed.  And the main

thing that's changed is he has the support of his family,

which, you know, as I was saying, I made sure he got all

the way through school.  I can continue, you know -- it's

never-ending  what we as parents are willing to do for our

son.  So, thank you for taking the time to talk to me.  I

hope that you will show some kindness in deciding his

sentence.

THE COURT:  Don't leave yet.  I have one or two

questions for you.

MS. STANTON:  Sure.

THE COURT:  First of all, he is so fortunate in

having you in his life.

MS. STANTON:  Thank you, I'm very fortunate

having him in my life.

THE COURT:  He's a very lucky young man.  Also,

and just curious, have you visited with him at the

detention center?

MS. STANTON:  I visit him every opportunity I, I

have.  Prior to, you know, the whole pandemic thing, I was

1    seeing him nearly every week when some of his friends

2    weren't.  Once things opened in October, I was able to see

3    him a few times and now that things have opened since

4    March, I'm there pretty much almost any week that I can,

5    that someone else isn't visiting him.  So, he visits with

6    me almost every week.  We talk every other day.  We email

7    all the time so I've had a lot of time to talk to him

8    about the serious things and to hear him tell me, you

9    know, mom, like, you know, this just got out of hand.

10   And, and really, he, he needed this to happen to stop this

11   cycle.  You know, he was caught up in something that was

12   so much bigger than him and he needed that to stop.  He

13   has such a good support system in his friends, good

14   friends, like real friends, people like Ms. Taylor-Smith

15   said, people that know him and love him and accept him

16   exactly how he is.  He doesn't have to, you know, pretend

17   to be something he's not.  So, he has right now and will

18   continue to have good positive role models of social

19   behavior, which is what really all individuals, children

20   through adults need when they are afflicted with an

21   autistic spectrum disorder.  They need to be around people

22   that are going to emulate the kind of positive behavior

23   that we all want to see from him.  We want to see him be a

24   productive member of society and I believe strongly that

25   with all of our help he will be that young man.

1          THE COURT:  Alright.  I, I do have a few other

2     questions.  First of all, after he's released from

3     custody, he goes on supervised release, I'm going to make

4     a condition of that, that he, he doesn't have unmonitored

5     access to a computer.

6          MS. STANTON:  That's fine.

7          THE COURT:  Through the probation office, they

8     put a device on the computer that would have to be

9     enforced.

10          MS. STANTON:  That will be.

11          THE COURT:  He wasn't living with you at the time

12     he committed these offenses?

13          MS. STANTON:  He was not.  He was living

14     independently.

15          THE COURT:  And what assurance do you have that

16     he'll live with you?

17          MS. STANTON:  I'm sorry.

18          THE COURT:  What assurance do you have he'll live

19     with you when you get out?

20          MS. STANTON:  We've recently bought a, a large

21     four-bedroom home.  I have more than enough room for

22     Justin.  He's got his own area.  You know, I would have no

23     issue whatsoever, nor does he, with any type of computer

24     supervision, monitoring needs to be done.

25          THE COURT:  And --

1          MS. STANTON:  This time in jail has taught Justin

2     that, you know, there's going to be some things you're

3     going to have to do once you're released and I know that

4     he will follow them to the letter.  He will also have our

5     supervision to make sure that that happens.

6          THE COURT:  Alright.  I, I'm not sure how much

7     you, you know about the offenses that he committed here.

8          MS. STANTON:  I do.  I'm fully aware of his

9     offenses. I've read, you know, everything on paper, you

10    know, everything.

11         THE COURT:  I'm reading that he has GED degree.

12         MS. STANTON:  He actually has a high school

13    diploma and did attend a semester at Wilmington

14    University.  So, he is, you know, he is - he did not

15    initially graduate high school but he did have a GED and

16    attended briefly some university.

17         THE COURT:  Now, I, I'm just curious.  This crime

18    was so sophisticated with use of the computers.  He went

19    into the computers, he got serial numbers of all these

20    parts, hard drives, services from Microsoft.  It's

21    incredible how he did all that and then he spent a

22    considerable amount of time talking to rep- repair people

23    on the phone in these different corporations, Cisco,

24    Microsoft.  Obviously, lying to them all the time, trying

25    to convince them he, that they should send him a duplicate

1   because he had a part that was defective and he was

2   supposed to send back the part after he got the new one

3   but, obviously, he had no part to send back.  This was a,

4   an offense involving four major companies that went on

5   over a considerable period of time.  Where did he learn

6   all these different things about computers?

7           MS. STANTON:  Justin's very sophisticated as far

8   as -- Justin does and has always had a lot of computer

9   knowledge.  Much like I was saying before though, part of

10  that is he's associating and was at the time, he was

11  associating with individuals that were making it seem it's

12  exciting, this is fun.  And, like a sponge, he's absorbing

13  this.  This is a way of social acceptance with these shady

14  peers.  And, you know, the more things I do, the more

15  they're impressed with me so I continue.  And I, I think a

16  lot of that was without him fully realizing, you know,

17  there were no repercussions for him.  You know, he wasn't

18  being arrested.  Other people were hey, great, Justin,

19  high five, you know.  He was being, he was modeling the

20  poor behavior that he was seeing from other people on the

21  internet, taking their advice and running with it and

22  concocted this very elaborate scheme that, you know, was

23  netting him a lot of money.  And it really, it wasn't even

24  about the money.  It was about social acceptance.  Similar

25  things like that, you know, happened in youth where you,

1    you know, download some stuff you're not supposed to but

2    all your peers think you're terrific for it.  That kind of

3    thing left unchecked and get to this point.  You know, and

4    again, with proper supervision from his family and

5    friends, he's not going to be in that spot again.  He's

6    learned a ton in the last two years, having to go through

7    being incarcerated and seeing how this has affected his

8    life.  And, you know, he'll tell you himself, this is not

9    something that will happen again.  Recidivism for Justin

10   is something I won't allow and, and none of us will allow.

11   It is not an option for him.  He is not, you know, a

12   criminal.  He's made some very bad choices, some bad

13   criminal choices but he's capable of so much more.  Just

14   that, you know, just what has happened himself, has

15   happened itself, shows you he's incredibly smart with

16   computers.  That smartness and that skill can translate

17   into many other socially acceptable profitable jobs for

18   him to allow him to become a contributing member of

19   society.

20            THE COURT:  Okay.  I, I have nothing further.

21   Any cross-examination?

22            MR. LOWE:  No, Your Honor.

23            THE COURT:  Alright.  Thank you.

24            MS. STANTON:  Thank you.

25            THE COURT:  Thank you.

1            MS. TAYLOR-SMITH:  Your Honor, I believe Ms.

2    Stanton will be speaking for the entire family but I would

3    at least like to acknowledge the other individuals who

4    appeared in court today.

5            THE COURT:  You may.

6            MS. TAYLOR-SMITH:  Your Honor, also present in

7    the courtroom on behalf of Mr. May is David Stanton.  That

8    would be his step-father.  Alex May who is his younger

9    brother.  Andrew Huddington (ph) I believe.

10           MR. PUDDINGTON:  Puddington.

11           MS. TAYLOR-SMITH:  Oh, I'm sorry, Puddington (ph)

12   and --

13           JACOB TABALLA:  Jacob Taballa.

14           MS. TAYLOR-SMITH:  Can you spell your last name

15   for me please?

16           MR. TABALLA:  T-A-B-A-L-L-A.

17           MS. TAYLOR-SMITH:  Jacob Taballa, all present in

18   the courtroom on behalf of Mr. May.

19           THE COURT:  Alright.  I'm assuming that Mr.

20   Puddington and Taballa are friends.

21           MS. TAYLOR-SMITH:  That's correct, Your Honor.

22   Mr. Puddington actually is one of the individuals who

23   submitted the letter to the Court.

24           THE COURT:  Yeah.  I, I read his letter.

25   Alright.  Anything else you want to say to the Court?

1          MS. TAYLOR-SMITH:  Your Honor, no.  I just -- let
2     me make sure I touched on everything and answered the
3     Court's questions.  No, Your Honor, I know that my client
4     is going to address the Court at some point when the Court
5     allows him to allocute so I'm not going to discuss too
6     much this portion but I just want the Court to, to take
7     this into consideration as well.  After having had had
8     conversations with Mr. May about what was in his mind or
9     what was he thinking, after he was released from, by this
10    Court, and awaiting sent- and awaiting sentencing when he
11    committed the additional offenses?  Mr. May is going to
12    talk about this in a little bit more detail.  The Court
13    has seen Dr. Weiss' assessment of him and so I just want
14    to read that portion into the record.  "While it cannot be
15    denied that persons with development disabilities and
16    mental disorders can plan and execute crimes, it is
17    important that individual's narratives and unique
18    qualities be considered in calculating their ultimate
19    culpability.  Mr. May having contemplated his behavior for
20    much of 2018 took responsibility for his actions.  He did
21    not, however, anticipate the devastating effects of
22    severing ties with the online world that he had created.
23    The continuation of his criminal behavior represents
24    presuicidal behavior as he did not expect to survive.
25    Thus, while the later sequence was intentional in the

1    sense that" -- I'm sorry, "in the sense of the

2    Government's observations that he is a repeat offender,

3    there is a second narrative.  That far from enriching

4    himself, Mr. May was trying to preserve fragments of his

5    identity while knowing he was saying farewell to the

6    world.  This interpretation is not meant to romanticize

7    criminal behavior, rather to add appropriate complexity to

8    the motivations of an impaired individual."  And with

9    that, the Defense would rest.

10         THE COURT:  Alright.  Mr. May, I'll have, I'll

11   hear anything you want to say to the Court before

12   sentence.

13         MS. TAYLOR-SMITH:  Now.

14         THE DEFENDANT:  Now?

15         MS. TAYLOR-SMITH:  Yeah.

16         THE DEFENDANT:  Oh okay.  I'm sorry.  I just need

17   a moment.  Good morning, Your Honor.  I appreciate the

18   opportunity to address the Court.  I intend to make a few

19   brief remarks.  I, first and most of all, wish to

20   apologize to my numerous victims.  I deeply regret

21   everything.  Particular shame is felt with regards to the

22   time and energy I forced investigators at the victim

23   corporations to expend in tracking me down.

24         THE COURT:   Alright, I'm going to ask you to

25   speak closer into the mic and --

1            THE DEFENDANT:  Oh, I'm sorry.  Should I start

2    over or --

3            THE COURT:  No, that's okay.  But --

4            THE DEFENDANT:  I'm sorry.

5            THE COURT:  -- speak, speak a little slower.

6    Okay?

7            THE DEFENDANT:  My actions are indefensible and I

8    will make no attempt to defend them.  I, I apologize for

9    the fraud I committed and the impact it had on the victim

10   corporations.  I also apologize for the pain I've caused

11   my family and friends.  I would also like to provide a bit

12   of context in my view for some of the criminal acts by

13   sharing my thoughts at the time I committed them.

14   Specifically, I'd like to address the offenses I committed

15   while on pretrial release, which is something that I did.

16   I committed offenses while on pretrial release.  I, I

17   believe that my intention was to box myself in.  That's

18   why, while committing the offense, I provided my real name

19   and address to the victim corporation numerous times.  The

20   idea was in part that by using my real name, that would

21   surely result in a quick arrest and maybe that would

22   finally, you know, give me the courage to do what I

23   planned, which was to commit suicide at the time of the

24   arrest, knowing that all was over.  That was the plan but

25   I want to be clear, nothing excuses the actions committed,

1    the other things that I did.  I'm only just trying to
2    share my mental state at the time just to say that I
3    wasn't in a very good place.  Throughout all my offenses,
4    I kept friends and family secluded and that was a major
5    mistake.  Other people are like tethers to me, they keep
6    me attached to the world around me and around them.  By
7    not sharing what I've done and what I've put myself and
8    others through, I hurt both them and myself and I regret
9    that immensely.  Today, things are different.  I have the
10   full support of family and friends who provide me with the
11   strength to withstand whatever comes next.  I've seen
12   where my worst actions live - lead and I live with the
13   consequences of them.  And though it's hard for me to
14   express it, I am truly and deeply sorry.  I, I thank the
15   Court for allowing me to speak today.
16          THE COURT:  Alright.  Anything further, Ms.
17   Taylor?
18          MS. TAYLOR-SMITH:  Nothing further from the
19   Defense, Your Honor.
20          THE COURT:  Alright, let me, let me hear from the
21   Government.  Mr. Lowe.
22          MR. LOWE:  Your Honor, we have on the phone with
23   us Mr. Tim Castro from Cisco Corporation who is going to
24   represent the victim and he would like to speak.  But
25   before we get to him, I'd just, I want to start out by

1    saying, and this may surprise Ms. Taylor-Smith and Mr.

2    May, I agree that his autism spectrum disorder should

3    warrant and does warrant a sentence below the guidelines.

4    I'll start with that.  I just don't agree with the extent

5    of the departure that Ms. Taylor-Smith is asking for and I

6    can explain a little bit why.  But, but I do think that he

7    doesn't need 151 months in prison and I do think that his

8    autism had something to do with the behavior here.  So,

9    starting with that, I'd like Mr. Castro to get the

10   opportunity to explain what the consequences were to Cisco

11   of Mr. May's behavior.  Mr. Castro, are you there?

12            MR. TIM CASTO:  Yes, I'm here.  Can you hear me

13   okay?

14            MR. LOWE:  Can we, can everyone hear him?  Yes.

15   Mr. Castro --

16            THE COURT:  Yeah, I --

17            MR. LOWE:  -- please go ahead and, and just tell

18   the Court what it is that you wanted to say on behalf of

19   Cisco.

20            THE COURT:  Wait.  I, I, I didn't get --

21            MR. CASTO:  Yes, absolutly, yes thank you.

22            THE COURT:  I didn't get his full name.

23            MR. LOWE:  Mr. Castro hold on --

24            MR. CASTO:  Yeah.  Thank you for allowing me the

25   opportunity to speak here today.

1          MR. LOWE:  Mr. Castro, hold on a second.

2          THE COURT:  I didn't get his full name.

3          MR. LOWE:  Your Honor, his name is Tim Castro, C-

4     A-S-T-R-O.

5          THE COURT:  Alright.  Mr. Castro, I'll hear

6     whatever you have to say.

7          MR. LOWE:  I'm sorry.  It's Mr. Tim Casto, C-A-S-

8     T-O, C-A-S-T-O.

9          THE COURT:  Oh, okay.

10         MR. LOWE:  Sorry, Mr. Casto.

11         MR. CASTO:  It's okay.  No worries.  But I was

12    going to correct it and then I, I started my statement,

13    thanks.

14         MR. LOWE:  Please go ahead.

15         MR. CASTO:  Okay.  Thank you.  The first off, I

16    just want to thank the Court for giving me the opportunity

17    to speak here today and we really appreciate the

18    accommodation to allow me to appear via telephone.  So, I

19    just wanted to provide some background and context as to

20    the nature of this fraud scheme and the impact it had on

21    Cisco as well as others.  As you may know, Cisco provides

22    equipment, software and services that form the backbone of

23    the internet and other networks.  In support of many of

24    Cisco's product lines, Cisco operates a customer service

25    model that provides for advance replacements.  What this

1    means is that Cisco will ship a replacement product to a

2    customer before that customer is required to return that

3    faulty product.  Cisco provides this type of support for

4    two reasons.  First, it provides assurances to its

5    customers that Cisco will stand behind its products if

6    there is a technical issue or a manufacturing defect.

7    Second, this type of support is necessary as it provides

8    replacements quickly for customers who may be experiencing

9    a network down type of issue where time is of the essence.

10   This is especially important for customers that are in

11   critical infrastructure, for example, banks or healthcare

12   providers.  In this particular case, Mr. May and his

13   associates took advantage of this cust- of this Cisco

14   customer support model.  They created more than 300 unique

15   Cisco IDs with the intent to defraud Cisco and nearly 400

16   service requests were initiated that resulted in the

17   shipment of more than 250 products with a list price value

18   of approximately 4.3 million dollars.  This type of --

19   excuse me -- the impact of this type of fraud is

20   significant, not only on Cisco but others as well.  There

21   is, of course, the financial loss in the product sent but

22   there are other impacts as well.  There are the cost of

23   third-party logistics in shipping products as well as the

24   storage of products.  There's also cost associated with

25   responding to fraudulent requests as this takes time and

1   resources away from supporting honest and legitimate

2   customers who may actually be experiencing technical

3   difficulties.  Lastly, the parts required through this

4   type of fraud scheme compete with legitimate Cisco

5   resellers who invest heavily in their relationship with

6   Cisco and selling Cisco products.  This undermines a

7   healthy robust marketplace for Cisco products as the

8   fraudulently acquired goods can be sold for a much, much

9   lower price than legitimate retailers could obtain for the

10  same product types.  Finally, Cisco just wants to

11  acknowledge the Government here.  We understand that the

12  Government has many competing priorities and limited

13  resources in deciding which cases to pursue.  So, we want

14  to thank the Government for the time and resources devoted

15  to this case, in particular, we'd like to thank Assistant

16  U.S. Attorney Michael Lowe as well as FBI Special Agent

17  Sean Norman.  I'm happy to answer any questions the Court

18  may have but that otherwise concludes my statement.

19          MR. LOWE:  I have no questions, Your Honor.

20          THE COURT:  Alright.  I have no questions, Mr.

21  Casto.  Thank you for the, the testimony.  It's most

22  helpful and at this point does the defense have any

23  questions?

24          MS. TAYLOR-SMITH:  Your Honor, Your Honor, I do

25  not have any questions.  And just so that the record is

1    clear, the defense does not object to the testimony of Mr.

2    Casto be it telephonically.

3            THE COURT:  Alright.  Okay.

4            MR. LOWE:  Thank you, Your Honor.

5            THE COURT:  We're, we're going to hang up then on

6    Mr. Casto's phone conversation.

7            MR. LOWE:  Thank you, Mr. Casto.

8            THE COURT:  Terminated.  Thank you.

9            MR. LOWE:  Your Honor, returning to what sentence

10   to impose, at least in my opinion.  There's a couple of

11   things that I think are important here and, and I'll

12   address some of the points that Ms. Taylor-Smith raised.

13   But I want to start with the, the loss amount and, and as

14   you know, we had stipulated to, in the first case, a loss

15   amount of, I think it was $3,449,000.00 some odd and that

16   was done as a, as a courtesy.  It was done as a courtesy

17   'cause Mr. May was cooperating at the time and the cutoff

18   for another plus 2 under the guidelines is $3,500,001.00.

19   So, I, in discussions with Cisco, learned that they have

20   this discount that they offer to legitimate Cisco

21   resellers of 42 percent off of the list pricing.  Now, Mr.

22   May was not a legitimate authorized reseller at any point

23   in time but as a courtesy, in order to reach a result that

24   I thought was more fair to him and to keep him below the

25   3.5 million dollar number, I spoke with Cisco to see how

1  they felt about it and they thought it was a fair way to

2  approach the matter.  So, we agreed to give him that 3,

3  that 42 percent discount.  If we hadn't done that -- and

4  at the end of the day, it's academic because with the

5  additional fraud in the second case, he wound up going

6  above the 3.5-million-dollar number anyway.  But the real

7  intended loss that he would've faced absent that kind of a

8  consideration in these cases was $5,693,439.00.  And as I

9  said, at the end of the day, the number that we all

10  stipulated to was 3,631,648, it's the same sentencing

11  range.  So, it doesn't matter.  But I bring it up because

12  I think it's important to know the scope of the fraud

13  here.  It, it wasn't the 42 percent discount.  In reality,

14  it was the, the higher number that he was starting with.

15  I know Mr. May blames a lot of this on his autism and, and

16  I feel for him, I feel for his family and I understand

17  that it makes an impact on how he approaches things in the

18  world.  To the extent though that it provides a blanket

19  excuse, that I simply don't agree with.  Much of what

20  happened here was calculated intentional conduct that he

21  knew was wrong.  We're not talking about a couple of times

22  where he, to make friends on social media or through the

23  internet in chat rooms, engaged in some kind of criminal

24  conduct.  This was literally hundreds of times.  For

25  Cisco, hundreds of times for Microsoft, hundreds of times

1   for Lenovo, and he made a lot of money.  At a minimum, he
2   made over $300,000.00 profit and that's reflected in the
3   orders of forfeiture that Your Honor signed.  He used that
4   money, among other things, to live, to pay his bills, he
5   bought a $65,000.00 BMW M2 with his money.  He had a cash
6   counting machine in his home and the fact that he knew
7   that all of this was wrong is reflected in the stuff that
8   he did in the first case, to hide his identify.  And those
9   are the bases of the money laundering counts that he plead
10  guilty to.  He sold these goods to equipment resellers in
11  New Jersey and then took the checks that they gave him and
12  rather than put them in his bank accounts, he took them to
13  a check cashing place and they cashed the checks for him
14  there so that he would have cash and it wouldn't his bank
15  account.  I bring that up, like I said, because I think
16  it's important to understand that he really did know what
17  he was doing was wrong and he did it in part to make
18  money.  Now, the second case, he's right.  He did use his
19  own name on several occasions.  It wasn't as if every
20  claim in the second case was in his own name.  Most were
21  not but he did leave a trail, enough of a trail anyway.  I
22  think part of what happened in the second case, my own
23  personal read on things, is that he didn't want to move in
24  with his, with his mom and I wish he had and he didn't -
25  at that time, he was still just making his money the same

1    exact way he'd been making it for years, which was

2    committing these types of frauds.  Mr. May, obviously,

3    regrets what he did.  I mean, he, he hadn't been in prison

4    before and, and I have no doubt that if on one of the

5    earlier occasions in his life if he had spent some time in

6    prison it might've, it might've had an impact.  But that's

7    no different than most defendants that we, we deal with

8    who hadn't served any time in prison.  Really, no one

9    appreciates the criminality of their conduct until they

10   get put into the MDC and then all of the sudden the world

11   comes crashing down and this becomes very real.  And, and

12   I don't doubt that he didn't think that he was going to go

13   to prison.  He had cooperated with the Government.  I

14   think he was hoping that he would've gotten a big break

15   and, and he very well may have.  So, what do to with Mr.

16   May.  He's clearly somebody that we have to worry about

17   going forward but I do believe that his autism played a

18   contributing factor and is, is an appropriate 3553 factor

19   warranting some kind of a variance.  Ms. Taylor-Smith has

20   asked for a sentencing range of 70 to 87 months, which is

21   less than half of what the advisor guideline range would

22   be.  I think a more fair number would be cutting about a

23   third of his sentence, which I think is a pretty generous

24   admission on my part.  I, I don't think a lot of people

25   would expect the Government lawyer to come in here and,

1   and agree for a guy who breeched his plea agreement,

2   committed more crimes and defrauded companies out of like,

3   realistically, five million dollars' worth of product to

4   come in here and say cut him a break of 50 something

5   months.  But I think a sentence of about 100 months takes

6   into con- it takes into account everything, not just what

7   he did but sort of mitigating factors that the defense has

8   tried to present to the Court.  And I think Ms. Taylor-

9   Smith did a very good job and, and I think she's very fair

10   and reasonable.  We're not -- I don't think I'm that far

11   off from where she thinks the number should line and I

12   think the reason that I, I, I'm asking for more time than

13   she is is because of what he did here was not a -- it

14   can't be minimized.  This is a massive, massive fraud that

15   netted him and his co-schemers a lot of money and he knew

16   all along that it was wrong, whether or not he had autism,

17   he did it, he did it for money, he made a lot of money and

18   he spent his money.  So, I think to sort of send the right

19   message to, to the, to society, to people who might do

20   this kind of thing again, to, to protect the public from

21   future crimes of the defendant and to take into

22   consideration what just punishment would be, I think a

23   sentence of 100 months is fair.

24        MS. TAYLOR-SMITH:  Your Honor, before we go any

25   further, would it be possible to take about a five to 10-

1   minute recess for a comfort break for my client?

2          THE COURT:  Yes.  And then I, I do have some

3   questions for Mr. Lowe.  Okay.

4          MS. TAYLOR-SMITH:  Thank you.

5          THE COURT:  We'll stand in recess.

6          ESR/CLERK FOLLMER:  All rise.

7               (Recess from 11:30 a.m. until, 11:38 a.m)

8          MS. TAYLOR-SMITH:  Thank you for your

9   consideration, Your Honor.

10         THE COURT:  Alright.  Mr. Lowe, Ms. Taylor-Smith

11  said that there was some cooperation from --

12         MR. LOWE:  Yes, Your Honor.

13         THE COURT:  -- this defendant.  He assisted in

14  the apprehension of another person?

15         MR. LOWE:  He did, Your Honor.  There was a, a

16  fugitive on a completely unrelated case but he happened to

17  know some information about that person and he provided it

18  to us, to the FBI, who passed it on down to the

19  authorities in, I think it was in Texas or Florida.  It

20  was in Florida.  And they were able to apprehend the

21  individual.

22         THE COURT:  And I, I think I heard also that

23  other persons in Texas he cooperated about.

24         MR. LOWE:  He did provide information as to those

25  persons.  I, I couldn't say if, if he hadn't had breeched

1    his plea agreement, I couldn't say that that would have

2    risen to the level of the 5K.  It may have.  We, we had a

3    lot of other evidence on those individuals as well,

4    including confessions.  But he did provide the information

5    and I think he was certainly well along the path to

6    getting a 5K.  I'll be, I'll be perfectly frank about

7    that.  He, had he not done what he did while on release,

8    he'd be in a very different position right now than, than

9    he is.

10            THE COURT:  And, and about how many times did he

11   meet with you and/or the, the FBI agent?

12            MR. LOWE:  My recollection is that he proffered

13   at least once if not twice and then he was signed up as an

14   FBI informant and we were going to try to utilize him and

15   his connections, and by we I should say the FBI, in the

16   online social engineering community to see if we could get

17   some evidence on other individuals.  That didn't pan out

18   but he did meet with the FBI on several occasions, maybe

19   three or so, to, to try to facilitate something like that.

20   It just, it never went anywhere but he was at least

21   essentially making the effort.

22            THE COURT:  And as part of his cooperation, did

23   he explain the intricacies of what occurred in this case?

24            MR. LOWE:  Yes.  He did.  He explained how he did

25   what he did and how he was on the social engineering site

1    that many others were engaged in similar conduct and how

2    they shared information.  He explained how he worked with

3    the individuals down in Texas.  So, yeah, we went through,

4    we went through what he did and he did explain it in, in

5    detail.

6          THE COURT:  Okay.  I, I have no other questions.

7    Is there anything else anyone wants to put on the record?

8          MS. TAYLOR-SMITH:  Nothing else from the defense,

9    Your Honor.

10          MR. LOWE:  No, Your Honor.  Thank you.

11          THE COURT:  Alright.  A court has to take into

12    account many factors in determining what's an appropriate

13    sentence.  I earlier alluded to the fact that we have, I

14    believe I did, a sentencing law 18 USC Section 3553(a)

15    which contains many factors the Court has to consider in

16    determining an appropriate sentence in a given case.

17    These factors give us guidance.  And one of the factors we

18    have to consider, although it's not mandatory, it's only

19    advisory, it's just a guideline, is the, is the federal

20    sentencing guideline.  I do note that both, both sides

21    agree that the guidelines as currently calculated would be

22    greater than necessary in this case and there should be

23    some variance from that guideline.  One of the factors we

24    have to consider is the need to avoid unwarranted sentence

25    disparities among defendants with similar record who have

1    been found guilty of similar conduct.  One of the reasons,

2    as I said a lot earlier this morning, before the creation

3    of the guidelines was to make sure that like defendants

4    who commit like crimes are treated essentially the same by

5    different judges.  And usually, we look to the guidelines

6    to make sure we avoid unwarranted sentence disparities

7    among defendants with similar records who have been found

8    guilty of similar conduct.  In this case, there is a

9    warranted reason to not look to the applicable guidelines

10   here to satisfy this factor and that the parties

11   essentially agree that there should be a variance,

12   downward variance from the guidelines that I've calculated

13   in this case and is reflected in the Presentence Report.

14   A Court also has to consider the nature and circumstances

15   of the offense.  This is a very serious offense, there's

16   no doubt.  It involved millions of dollars and there are

17   at least four victims which have spent a considerable

18   amount of time trying to understand what occurred here,

19   working with law enforcement, perhaps modifying the

20   procedures they were following in handling warranty claims

21   or repair claims.  I did note that Mr. Castro, Casto said

22   that the loss is considerable in a case like this to a

23   company.  Obviously, these companies spend a considerable

24   amount of time and effort to create products which really

25   have enhanced the quality of life of so many in this

1    society.  And yet, they are preyed upon by persons who

2    have the unique knowledge of how computers work and take

3    advantage of, of the, these companies in a way where, as

4    Mr. Castro said, the loss to the company is considerable.

5    I, I don't want to repeat everything he said but one thing

6    that resonates and it's reflected in the Presentence

7    Report is that it deprives them of the opportunity to

8    serve, provide service to legitimate customers.  These are

9    people that, are companies that have paid money for the

10   product.  The product may have had a problem and the

11   company like Cisco and Microsoft, the other companies,

12   they, involved in this case, they have a need to live up

13   to the warranties that they've given to customers and it

14   deprives them of the opportunity to do so.  These

15   companies are seriously affected by the kind of fraud that

16   was committed in this case, let alone the tax evasion

17   that's associated with the fraud, as Mr. May has plead

18   guilty to.  This, this - these, these offenses that are in

19   front of me, fraud, money laundering, tax evasion,

20   occurred over a considerable period of time, involved a

21   lot of planning, a lot of cunning and involved multiple

22   persons.  And I consider these kinds of offenses, they're

23   property offenses, they're most serious and I do note they

24   resulted, it's resulted not only in a forfeiture but it

25   will result in the payment of restitution.  So, Mr. May

1    will be under considerable financial obligation for quite

2    a bit of time.  I also have to consider as another factor

3    the history and characteristics of the defendant.  I note

4    that Mr. May is 31 years of age.  Obviously, he has

5    tremendous family support.  It's – I listened very

6    carefully to what his mother, Susan Stanton, has said.

7    She was very candid with the Court.  I read the other

8    letters submitted and I note the presence of his step-

9    father, David, David Stanton, in court and his brother,

10   Alex May, and his friends, Andrew Puddington and Jacob

11   Taballa.  Mr. May has to make a decision.  Does he want to

12   be with those people sitting around the dining room table

13   at, at home or does he want to visit with them at a

14   federal correction institution in the visiting room?  I

15   think I know the answer to that question.  But it's got

16   to, it's got to come from within, within him.  But he has

17   tremendous support and, and the fact that he has this

18   support is something that points to the fact that he may

19   not commit like crimes in the future.  He did provide what

20   I consider to be a significant amount of cooperation with

21   the Government.  He did the right thing, at least to the

22   extent that he did cooperate.  They brought somebody to

23   justice and he was providing information in other areas

24   and, most importantly, he explained the intricacies of how

25   this crime occurred, because this a very sophisticated

1    crime.  Very few people, maybe that's overstating it, but

2    a lot of people don't have the knowledge of computers that

3    he did to pull off the, the kind of crimes that were

4    engaged in this case.  I do know he has a GED degree and

5    he, he doesn't report any abuse of drugs or abuse of

6    alcohol.  He certainly, he has, what I'll, what I'll call

7    a prior record but it's – I don't consider it to be

8    anywhere as serious as the cri- kind of crimes he

9    committed here, although I don't want to understate the,

10   the seriousness of terroristic threats or damaging

11   property and engaging in disorderly conduct, not

12   acceptable conduct at all.  But, obviously, the, the one

13   fact which is a huge factor in this case in dealing with

14   his history and characteristics, is his autism.  And when

15   I say autism, the psychiatrist, Dr. Weiss, has described

16   it as autism spectrum disorder, ASD.  He also notes that

17   he has attention deficit hyperactivity disorder, A- ADHD,

18   and depression.  So, he has more than just the autism

19   spectrum disorder but that's the disorder that's been

20   focused on in the courtroom today and essentially in the

21   report.  And there is something in the nature of this

22   disorder that could influence a person to engage in the

23   kind of conduct that Mr. May engaged in in this courtroom.

24   I don't want to go into all the details.  It's been said

25   many times by different persons on this record already

1    today but there is a concern that this is not a disorder

2    that just goes away because somebody is incarcerated or

3    placed on supervised release.  And I do have some concern

4    about the future activity but I have the assurance of his

5    mother and even Mr. May, from what Mr. May said and I

6    listened very carefully to what he said, that all steps

7    will be taken to deal with this disorder and prevent him

8    from engaging in the kind of conduct he engaged in in this

9    case in the future.  But Mr. May has a good deal in his

10   favor in terms of his history and characteristics.  I

11   don't look upon - I do agree with Mr. Lowe that we can't

12   let a disorder be a blank- blanket excuse for committing

13   offenses but we can take it into account as a, as a factor

14   that might cause a person to engage in behavior that's

15   just not acceptable in society.  There are other factors

16   that a Court has to consider in determining what's an

17   appropriate sentence and these factors I'm to consider in

18   imposing a sentence that is sufficient but not greater

19   than necessary, to take them into account.  I have to

20   consider the need for the sentence to reflect the

21   seriousness of the offense and I've already discussed

22   that.  It's been discussed on this record by others.  I

23   have to consider the fact that, that the sentence has to

24   promote respect for the law.  When Mr. May was engaging in

25   the kind of conduct he did, obviously, he was not

1    respecting the law.  When you don't respect the law, you

2    may end up being a defendant in a criminal case, putting

3    yourself at the mercy of a federal judge and respecting

4    the law is a big factor here.  Also, the need to afford

5    deterrence is a big factor in sentencing.  Deterrence

6    comes in two forms, a general deterrence, a sentence has

7    to convince others that they should not commit crimes like

8    this and it also has to deter Mr. May from committing

9    future crimes.  I'm hoping he gets it with the sentence I

10   will impose and given the time he's already served.  What

11   I'm hearing from his mother and perhaps Mr., Mr. May I can

12   draw the conclusion that he gets the need to be deterred

13   from committing like crimes in the future.  I also have to

14   consider the need to protect the public from further

15   crimes by Mr. May and the sentence will take this into

16   account.  Obviously, there will be a sentence of

17   incarceration.  That's part of the sen- that would be

18   imposed.  Also, there'll be an extensive period of

19   supervised release so he will be under the jurisdiction of

20   the Court for a considerable period of time.  If he

21   commits future crimes, he may be back and I'm sure that's

22   not what his family wants nor does he want.  But society

23   has to be protected from further crimes of this nature.  I

24   will make part of the sentence a, the fact that he's not

25   to use a computer unless it has the monitoring equipment

1   attached that the U.S. Probation Office monitor, uses in
2   monitor, in order to monitor persons who commit crimes
3   with computers.  I have to consider the need to provide
4   him with education or vocational training and other
5   correctional treatment in the most effective manner.  I
6   will recommend to the United States Bureau of Prisons that
7   he get mental health counseling.  I think that's an
8   important component of the sentence and also while he's on
9   supervised release.  I have to consider the kinds of
10  sentences available.  Obviously, anything short of
11  incarceration would not be warranted here and a sentence,
12  a sentence of incarceration is warranted and I've
13  considered other kinds of sentences but there has to be
14  incarceration and supervised release considering all of
15  the factors.  I've considered the ranges recommended in
16  the sentencing guidelines and any pertinent policy
17  statements issue by the sentencing commission pursuant to
18  law and I can't think of any that are applicable here and
19  I've already discussed the need to avoid unwarranted
20  sentence disparities among defendants with similar records
21  who have been found guilty of similar conduct.  And the
22  last factor I have to consider is the need to provide
23  victims with restitution and restitution will be ordered
24  in this case.  Having considered all these factors and all
25  the written submissions that have been made by the

1    parties, the arguments of counsel, Mrs. Stanton's

2    testimony and Mr. May's statement to the Court, and the

3    presence of so many on his behalf, I'm prepared to impose

4    the, the following sentence and Mr. May does get credit

5    for time served already.  But that is calculated by the

6    United States Bureau of Prisons, not by, not by the Court.

7    Pursuant to the Sentencing Reform Act of 1984, the

8    judgment of the Court that the defendant, Justin David

9    May, is hereby committed to the custody of the Bureau of

10   Prisons to be imprisoned for a term of 92 months.  This

11   term is comprised of a term of 56 months on each of counts

12   1 through 20 and 31 through 45 of docket number 18-20, 26,

13   such terms to run concurrently and a term of 36 months in

14   each of counts 1 through 22 of docket number 19-417, such

15   terms to be served concurrently to each other but

16   consecutive to the terms imposed on counts 1 through 20

17   and 31 through 30-45 of docket number 26 - 18 USC 26 to

18   produce a total term of 92 months.  Upon release from

19   imprisonment, the defendant shall be placed on supervised

20   release for a term of five years on each of counts 1

21   through 20 of docket number 18-26 and a term of three

22   years on each of counts 31 through 45 of docket number 18-

23   26 and counts 1 through 22 of docket number 19-417, such

24   terms to be served concurrently.  Within 72 hours of

25   release from the custody of the Bureau of Prisons, the

1    defendant shall report in person to the probation office

2    in the district in which the defendant is released.  While

3    on supervised release, the defendant shall not commit

4    another federal, state or local crime, shall be prohibited

5    from possessing a firearm or other dangerous device, shall

6    not possess an illegal controlled substance and shall

7    comply with the other standard conditions that have been

8    adopted by this Court.  The defendant must submit to one

9    drug test within 15 days of commencement of supervised

10   release and at least two tests thereafter as determined by

11   the probation officer.  The defendant shall submit to the

12   collection of a DNA sample at the direction of the United

13   States Probation Office pursuant to Section 3 of the DNA

14   Analysis Backlog Elimination Act of 2000 of 42 USC Section

15   14135(a).  And again, the, the reason for the variance is

16   the agreement of the parties that there should be a

17   variance and certainly his autism and how it's been

18   described on this record as affecting him in the offense.

19   In addition, the defendant shall comply with the following

20   special conditions.  The defendant shall participate in a

21   mental health program evaluation with the focus on anger

22   management and/or treatment and abide by the rules of any

23   such program until satisfactorily discharged.  I'm going

24   to make the same recommendation to the United States

25   Bureau of Prisons.  The defendant is to cooperate with the

1    Internal Revenue Service by filing all delinquent or

2    amended returns and by timely filing all future returns

3    that come due during the period of supervised release.

4    The defendant is to properly report all correct taxable

5    income and claim only allowable expenses on those returns.

6    The defendant is to provide all appropriate documentation

7    in support of said returns.  Upon request, the defendant

8    is to furnish the Internal Revenue Service with

9    information pertaining to all assets and liabilities and

10   the defendant is to fully cooperate by paying all taxes,

11   interest and penalties due and otherwise comply with the

12   tax laws of the United States.  The defendant shall

13   provide the U.S. Probation Office with full disclosure of

14   his financial records to include yearly income tax returns

15   upon the request of the U.S. Probation Office.  The

16   defendant shall cooperate with the probation officer in

17   the investigation of his financial dealings and shall

18   provide truthful monthly statements of his income.  The

19   defendant is prohibited from incurring any new credit card

20   charges, any new credit charges or opening additional

21   lines of credit without the approval of the U.S. Probation

22   - of the probation officer unless the defendant is

23   compliance with a payment schedule for any fine, well not

24   fine, or any restitution obligation.  The defendant shall

25   not incumber or liquidate interest in any assets unless it

1    is in direct service of the restitution obligation or

2    otherwise has the expressed approval of the Court.  As a

3    further special condition of supervised release, the

4    defendant is to refrain from self-employment similar to

5    that described in the incident offense and also I will

6    require that any, any computer or computer device, be it a

7    PC or laptop, a Smartphone, any kind of computer device

8    that he has access to be monitored by equipment installed

9    by the United States Probation Office.  And I will make

10   sure we, we cover this as an appropriate condition of, of

11   the, of the sentence.  I -- with respect to the, the last

12   two conditions I just imposed, I find that there is a

13   reasonably direct relationship existing between the

14   defendant's, what I'll call occupation, business or

15   profession as reflected in this case in the conduct

16   relevant to the offense of conviction.  An imposition of

17   such a restriction is reasonably necessary to protect the

18   public because there is reason to believe that absent the

19   restriction the defendant will continue to engage in

20   unlawful conduct similar to that for which the defendant

21   was convicted and I also find that the timeframe of the

22   supervised release and the structure of the special

23   condition is for the minimum timeframe and to the minimum

24   extent necessary to protect the public.  And with respect

25   to -- this is with respect to the defendant refraining

1    from self-employment similar to that described in the

2    incident offense and because he used computers the way he

3    did in order to carry out this offense.  I also find that

4    there's a direct relationship between the condition

5    requiring monitoring of the computers and his offense of

6    conviction and that this kind of condition is necessary to

7    protect the public also.  And I, I do have a concern

8    defendant will continue to engage in unlawful conduct

9    similar to that for which he was convicted and, again, the

10   timeframe for this restriction while he's on supervised

11   release is the minimum timeframe and to the minimum extent

12   necessary to protect the public.  It is further ordered

13   that the defendant shall pay restitution in the amount of

14   $4,021,225.00.  The Court will waive the interest

15   requirement in this case.  The rest- the payment should be

16   made payable to the Clerk of the U.S. District Court for

17   proportionate distribution to the Cisco Systems, Inc. in

18   care of Erica Brand Portnoy (ph), Sideman & Bankrupt-

19   Bancroft, LLP, 1 Embarcadero Center, San Francisco, CA

20   94111 in the amount of $3,449,567.00, to Microsoft Fraud

21   Investigation Strike Team, attention of Investigator Jack

22   Williams (ph), 1 Microsoft Way, Redmond, WA 98052 in the

23   amount of $364,761.00, to the IRS in care of IRS-RACS, R-

24   A-C-S, attention Mail Stop 6261 Restitution, 333 W.

25   Pershing Avenue, Kansas City, MO 64101 in the amount of

1   $52,497.00, to Lovana- Len- Lenevo- Lenovo, attention

2   David Strong (ph), Lenovo Treasury Director, 8001

3   Development Drive, Morrisville, NC 27560 in the amount of

4   $143,000.00 and to APC, attention Michael J. McCarthy

5   (ph), legal counsel, Schneider Electric, 132 Fairground

6   Road, West Kingston, Rhode Island 02892 in the amount of

7   $11,400.00.  The restitution is due immediately.  It is

8   recommended that the defendant participate in the Bureau

9   of Prisons Inmate Financial Responsibility Program and

10  provide a minimum payment of $25.00 per quarter to his

11  restitution.  In the event the entire amount is not paid

12  prior to the commencement of supervision, the defendant

13  shall satisfy the amount due in monthly installments of

14  not less than $200.00 to commence 30 days after release

15  from confinement.  And I have looked carefully at the

16  finances that Mr. May has as reflected in the Presentence

17  Report and I'm ordering that kind of restitution

18  consistent with what I see in the Presentence Report as to

19  his finances.  The defendant shall notify the United

20  States Attorney for this District within 30 days of any

21  change of mailing address or residence that occurs while

22  any portion of the restitution remains unpaid.  The Court

23  finds that the defendant does not have the ability to pay

24  a fine.  The Court will waive the fine in this case.  It

25  is further ordered that the defendant shall pay to the

1    United States a total special assessment of $5,700.00

2    which shall be due immediately.  This is the sentence of

3    the Court.  Is there any question about the sentence?

4            MS. TAYLOR-SMITH:  No, Your Honor.

5            MR. LOWE:  Your Honor, I would ask, however, that

6    the judgment and commitment order also reflect the two

7    forfeiture orders that were entered.

8            THE COURT:  That'll be done.

9            MR. LOWE:  Thank you, Your Honor.

10           THE COURT:  I'm just wondering if you want me to

11    recommend that he be incarcerated at an institution of the

12    Bureau of Prisons as close to the Philadelphia area as

13    possible?

14           MS. TAYLOR-SMITH:  Yes, Your Honor.

15           THE COURT:  Alright.  We'll, we'll make that

16    recommendation to the Bureau of Prisons and, Mr. May, you

17    have a right to appeal the, the sentence that's just been

18    imposed.  You have 14 days to file the Notice of Appeal

19    either from today or when the judgment is entered in your

20    case.  The judgment is the sentence I just pronounced

21    orally reduced to writing and it's filed with the clerk of

22    the court.  And if you can't afford, afford to pay the

23    filing fee to take the Notice of Appeal, please notify the

24    clerk of the court and the clerk of the court will file

25    the Notice of Appeal on your behalf.  I did notice that he

1  had a plea agreement in the first case, the 19-417 with an

2  appellant waiver provision in it.  Obviously, the second

3  case was an open plea.  I'm not sure how that would affect

4  his rights on appeal.  But I have no say in what you do,

5  whether you take an appeal.  That's strictly between you

6  and your, your lawyer, Mr. May, so speak to Ms. Taylor-

7  Smith and consult with her about whether you want to take

8  an appeal but there is an appellant waiver provision in

9  effect, at least in the 19-417 when Mr. May gave up

10  certain rights on appeal.  Anything further anyone wants

11  to put on the record?

12          MR. LOWE:  Your Honor, the Government -- I

13  submitted to Mr. Higgins (ph) a --

14          THE COURT:  Your motion to dismiss?

15          MR. LOWE:  -- motion to dismiss, yes, Your Honor.

16          THE COURT:  Yeah.

17          MR. LOWE:  The, specifically, just so everyone

18  knows, the counts that I had agreed to dismiss, which I

19  believe was counts 21 through 30 of the first case.

20          THE COURT:  Alright.  Can you submit a, a written

21  order?

22          MR. LOWE:  I did, Your Honor.  That was attached

23  to what I sent to Mr. Higgins.  I can, I can send it over

24  again.

25          THE COURT:  Alright.  I will tell Mr. Higgins to

1    – I will sign it and I'll tell Mr. Higgins to file the

2    record.

3            MR. LOWE:  Thank you, Your Honor.

4            THE COURT:  Okay?

5            MR. LOWE:  Yes, Your Honor.

6            THE COURT:  And we'll, we'll get that done.

7    Alright.  I don't think there's anything else to be done

8    now.  Anything else anybody wants put on the record?

9            MS. TAYLOR-SMITH:  Nothing from the defense, Your

10   Honor.

11           MR. LOWE:  No, Your Honor.  Thank you.

12           THE COURT:  We'll stand in recess.

13           MS. TAYLOR-SMITH:  Thank you.

14           ESR/CLERK FOLLMER:  All rise.

15                  (Court adjourned at 12:12 p.m.)

CERTIFICATE

I, Stephanie Garcia, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

July 8, 2021